# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### January 29, 2013 Session

## STATE OF TENNESSEE v. SOMER M. BULLARD

**Appeal from the Criminal Court for Knox County**
**No. 95106     Jon Kerry Blackwood, Judge**

---

**No. E2012-00466-CCA-R3-CD - Filed May 7, 2013**

---

Appellant, Somer M. Bullard, was convicted of six counts of aggravated robbery representing two alternate theories of three separate offenses. The trial court merged the two convictions for each offense and sentenced appellant to concurrent sentences of eleven years for each of the three convictions, to be served in the Tennessee Department of Correction. Appellant raises the following issues in this direct appeal: (1) whether the trial court violated her right to a speedy trial; and (2) whether the trial court erred in sentencing her to an eleven-year effective sentence. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which ALAN E. GLENN and JEFFREY S. BIVINS, JJ., joined.

Mark Stephens, District Public Defender, and Robert C. Edwards, Assistant District Public Defender, Knoxville, Tennessee, for the appellant, Somer M. Bullard.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Senior Counsel; Randall E. Nichols, District Attorney General, and Ta Kisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This matter arises from appellant's participation in the aggravated robberies of three pharmacies in Knox County, Tennessee, in May of 2010. The State indicted appellant for eighteen counts of aggravated robbery, consisting of six alternate theories for three separate offenses. Prior to trial, the State dismissed twelve of the counts and proceeded to trial on six counts.

## I. Facts

The State's first witness at trial was Spencer Cowart, a pharmacist at Walgreens in Knox County. Mr. Cowart testified that on May 10, 2010, he was working the overnight shift when appellant approached the counter, produced a note, and directed him to read the note. The note instructed him to give appellant OxyContin and oxycodone and indicated that appellant was "serious." Appellant pulled up her shirt to reveal a gun in the waistband of her pants. Mr. Cowart testified that when he saw the gun, he wanted to get appellant what she wanted as quickly as possible so she would leave the store.

Mr. Cowart acknowledged that the store was equipped with surveillance cameras and that some of the robbery was captured on video. In viewing the video, Mr. Cowart identified appellant and narrated as appellant directed him to read the note, get the medications, and place the drugs on the counter. He also pointed out appellant's showing him the gun. Mr. Cowart identified Exhibit 1 as a copy of the note appellant handed him. In the note, appellant demanded all of the twenty and thirty milligram OxyContin and Roxicodone. The note further indicated that appellant did not want anyone to be hurt, that she "had people inside and outside," and that she was not "f****** playing." In proclaiming that she was serious, appellant also referenced her waist, at which she concealed a weapon.

Mr. Cowart also verified Exhibit 2 as the photograph array shown to him on May 19, 2010, from which he identified appellant as the person who displayed the gun and robbed him.

The State then called April Robertson, who testified that she attended school with appellant in grades six through twelve. Ms. Robertson was working as a pharmacy technician at CVS on May 14, 2010, when appellant robbed the pharmacy. She recalled appellant's instructions, stating,

> [S]he instructed me to come from my side of the counter out to her, and so I did. She let me know that she had been in the store and that she had a gun and that she would harm me and some children up front if I didn't give her all of our high milligram OxyContin and oxycodone. And then she pulled up her sweatshirt and showed me that she had a gun, and so I walked her back around to my side of the counter, to the pharmacist, told him what had happened.

Ms. Robertson testified that she believed appellant to be armed and stated, "I was afraid for my life and for the children that she was threatening up front in the store." Ms. Robertson confirmed the presence of numerous surveillance cameras throughout the store, as well as

outside of the store. From the video that captured the exterior of the store, she identified appellant as appellant approached the front door of the store.

On cross-examination, Ms. Robertson admitted that during the incident, she only observed the handle and the grip on the handle of the pistol and agreed that it looked more like a BB pistol. However, upon redirect examination, Ms. Robertson stated, "I believed it to be a real gun." She reiterated, "[Appellant] threatened my life and some other lives of customers in my store. I had no reason to believe it wasn't a real gun. She was threatening to use it. So I was in fear for my life."

The State's next witness was Jack Johnson, a pharmacist for CVS on Middlebrook Pike in Knox County. He testified that he was filling prescriptions on May 22, 2010, at the noon hour. The store was busy that Saturday, and Ryan, a new employee who had been working at the store for approximately two days, handed him a note that read, "Give me all your OxyContins 40, 60, and 80 milligram. Don't turn a robbery into a homicide."

Mr. Johnson recalled that he first saw the weapon when appellant said, "I'm not playing," and pulled up her shirt to reveal the gun in the waistband of her sweatpants. He then assured appellant that he would not give her any trouble and proceeded to the back of the store where the narcotics were locked in a safe. Mr. Johnson placed several bottles of the requested narcotics in a CVS plastic bag and gave them to appellant. He watched appellant leave his line of sight and immediately called 9-1-1. He confirmed his identification of appellant from the Federal Bureau of Investigation's ("FBI") photograph lineup.

The State's next witness was Donald Searle. Mr. Searle testified that on the afternoon of May 22, 2010, he was standing in the parking lot of First Tennessee Bank, which is adjacent to the CVS parking lot, waiting for a friend. He observed a young lady with a small bag in her hand, possibly something in each hand, run from the store and enter a car. He watched as the driver and young lady sped away in a reckless manner. Mr. Searle completed his banking business, and upon exiting the bank, he noticed several police cars at CVS. He went over to the store, spoke with a police officer, and described the scene he observed from the bank's parking lot.

On cross-examination, Mr. Searle recalled that he saw that the driver's side car window was down and that he observed a young man driving the vehicle. He stated the young man appeared to be waiting for the woman to exit the store because they immediately drove away.

Jeff Day, a violent crimes investigator with the Knoxville Police Department, testified that he was acquainted with appellant because she and her family lived across the street from

him from 1999 through 2004 or 2005. Investigator Day explained that because Ms. Robertson knew and identified appellant at one of the crime scenes, he and his partner checked the local motels near the scene, one of which was the Motel 6 on Merchants Center Boulevard. When he showed appellant's photograph to the desk clerk, the clerk recognized appellant and indicated that she was staying in a room upstairs. Upon checking the designated room, a male occupant came to the door and stated that appellant and her boyfriend had taken his car, a white Scion, and had not returned. Investigator Day and his partner waited in an empty room down the hall for appellant and her boyfriend to return. They soon observed the white vehicle approach, and when the suspects appeared, the officers "jumped out" on the suspects, chased them, and apprehended them. Investigator Day grabbed appellant and his partner restrained the male suspect. At trial, Investigator Day identified numerous photographs as exhibits that the State moved into evidence, among which was a photograph of a black BB gun.

After leaving the motel, Investigator Day interviewed appellant at the Knoxville Police Department. He read appellant a rights waiver, which they both signed. Investigator Day summarized his interview with appellant, stating that she "was very cooperative [and] seemed to be very honest with [him] about what happened. She . . . admitted to [him] that she had committed each of the robberies in question." When Investigator Day questioned appellant about weapons used in the robberies, she said "that she did have that BB gun for each robbery."

On cross-examination, Investigator Day acknowledged that appellant's family formerly lived across the street from his family, and appellant occasionally babysat his children. He stated that he had not seen appellant from the time he moved from the neighborhood until the robbery incident. He acknowledged that appellant was arrested at the motel about twenty to thirty minutes after the robbery and that when he caught appellant, she had a mouthful of pills. He ordered appellant to spit out the pills, and she complied. Investigator Day disagreed that appellant seemed "buzzed" during the lengthy interview. He stated, "She seemed fairly coherent. Almost like she was coming off more than – her scratchy throat and almost like a dry mouth – but yeah, she seemed fairly coherent, actually, considering." The State rested its case-in-chief.

Appellant testified that she met Aaron Keisler at sixteen years of age. She began using OxyContin, dropped out of high school in the eleventh grade, and ran away from home. She explained that she and Mr. Keisler lived with his father until his father was arrested and taken to jail. Afterward, they lived in hotel rooms, and she worked as a stripper and prostitute to support their drug habit. Mr. Keisler did not work.

-4-

Appellant stated she met Rebecca Gann and Whitney Soard when she purchased crack cocaine at a crack house. Appellant testified that Ms. Soard first mentioned the idea of robbery to her and stated, "They pretty much came to me with the idea that they needed someone new." She recalled that this conversation occurred on May 11, 2010,[1] because it was the same day she committed the first robbery. In summarizing the first robbery, appellant testified that she believed it was a CVS, and she carried a note written by Ms. Gann, who was waiting in the car, and a BB gun that belonged to Ms. Gann's son. Appellant stated that before each robbery, Ms. Gann would bring pills along with her, and they would "[get] high" together. Consequently, appellant did not remember much about the robberies. Appellant remembered more of the May 22, 2010 robbery, when Mr. Keisler was waiting in the car, because it was the day she was arrested. She recalled that when Investigator Day chased her, she swallowed some pills because she knew she was about to be arrested. However, she had too many pills in her mouth, so she had to "spit some out."

Appellant claimed that she was "high" during the interview with Investigator Day. She testified that it was not until she was arrested that she first learned how long this group of people had been committing robberies. She stated, "I just knew that they said they had done some that they had gotten away with." Appellant stated that the eleven days between her first and last robbery were the only times she was involved in a robbery in any capacity, and she never intended to harm anyone.

On cross-examination, appellant explained in detail the events leading up to each robbery and how the robberies progressed. She thought that she did not adequately convey to the victims her seriousness about her intent to commit the robberies, and thus, she resorted to exposing the perceived weapon in her waistband out of desperation. Appellant admitted that she contradicted Mr. Keisler's request that the robberies be committed outside of Knox County and instead listened to others in the group because she "wanted to get high." Appellant recalled her interview with Investigator Day and stated, "I was on a high milligram of OxyContin during my interview. . . You can hear as the interview progresses that I'm mumbly, the – I mean, it's – you can tell that I'm high in that video."

On redirect examination, appellant expressed remorse for her actions and apologized to each victim.

Appellant's mother, Gena Michelle Burnette, was called as the next witness. Ms. Burnette testified that appellant was a good student in middle school and responded well to parenting. Ms. Burnette recalled the day preceding appellant's arrest, which was May 21,

---

[1] There is some discrepancy between whether the offense occurred on May 10 or May 11, 2010, because Mr. Cowart was working an overnight shift that spanned both dates.

2010, Mother's Day. Appellant spent the day with her daughter and Ms. Burnette. During the day, Mr. Keisler called appellant's cellular telephone approximately one hundred times, asking appellant to return to the hotel. Ms. Burnette stated that from her experience with Mr. Keisler, this type of behavior was typical.

On cross-examination, Ms. Burnette testified that she returned appellant to the hotel at the close of their Mother's Day visit. She stated that she had no knowledge of appellant's visiting another pharmacy after their visit.

Following deliberations, the jury found appellant guilty of six counts of aggravated robbery. At the sentencing hearing, the trial court found that appellant had a prior history of criminal behavior, that she had previously been unwilling to comply with the conditions of sentence involving release into the community, and that she was on probation when she committed the instant offenses. Tenn. Code Ann. § 40-35-114(1), (8), (13)(C) (2010). Because the convictions involved two alternate theories of three criminal offenses, the trial court merged three of the convictions and sentenced appellant to three concurrent sentences of eleven years each, to be served in the Tennessee Department of Correction. This appeal follows.

## II. Analysis

Appellant raises two issues for our review: whether the trial court erroneously violated her right to a speedy trial; and whether the trial court erred in ordering eleven-year sentences.

### A. Right to a Speedy Trial

The Sixth Amendment to the United States Constitution states that "in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. This provision was made applicable to the states through the Fourteenth Amendment to the United States Constitution. *State v. Simmons*, 54 S.W.3d 755, 758 n.4 (2001) (citing *Klopfer v. North Carolina*, 386 U.S. 213 (1967)). Likewise, the Tennessee Constitution provides the same guarantee for criminal defendants. *See* Tenn. Const. art. I, § 9. "The speedy trial guarantee is designed to protect the accused from oppressive pre-trial incarceration, the anxiety and concern due to unresolved criminal charges, and the risk that the accused's defense will be impaired by dimming memories or lost evidence." *Simmons*, 54 S.W.3d at 758. The right to a speedy trial is triggered when an accused is arrested or when a grand jury issues a formal accusation or indictment. *State v. Hudgins*, 188 S.W.3d 663, 667 (Tenn. Crim. App. 2005) (citing *State v. Utley*, 956 S.W.2d 489, 492 (Tenn. 1997)). We review a trial court's determination of whether a defendant's right to a speedy trial was violated under an abuse of discretion standard. *Hudgins*, 188 S.W.3d at 667.

In *Barker v. Wingo*, 407 U.S. 514, 530 (1972), the Supreme Court set forth four factors to be considered when reviewing an alleged violation of an accused's right to a speedy trial, including the "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *See Simmons*, 54 S.W.3d at 759. Our supreme court has cited with approval the application of the *Barker* analysis in Tennessee. *Simmons*, 54 S.W.3d at 759 (citing *State v. Bishop*, 493 S.W.2d 81, 83-85 (Tenn. 1977)). If, after applying the *Barker* balancing test, a court determines that an accused's right to a speedy trial has been violated, "the remedy is reversal of the conviction and dismissal of the criminal charges." *Id.*[2]

Considering first the length of the delay, we note that unless "there is some delay [that] is presumptively prejudicial, it is not necessary to inquire into the other balancing factors of the speedy trial analysis." *Id.* (citing *Barker*, 407 U.S. at 530; *State v. Wood*, 924 S.W.2d 342, 346 (Tenn. 1996)). A delay following a formal accusation must "generally" be one year or longer to trigger a speedy trial analysis. *Id.* If this threshold is crossed, a reviewing court must employ a balancing test to determine the merits of the speedy trial issue. *State v. Bates*, 313 S.W.3d 265, 270 (Tenn. Crim. App. 2009). In doing so, we must inquire as to the reasons for the delay. Reasons for delay fall within four identifiable categories: "(1) intentional delay to gain a tactical advantage over the defense or delay designed to harass the defendant; (2) bureaucratic indifference or negligence; (3) delay necessary to the fair and effective prosecution of the case; and (4) delay caused, or acquiesced in, by the defense." *State v. Vickers*, 985 S.W.2d 1, 5-6 (Tenn. Crim. App. 1997) (citing *Wood*, 924 S.W.2d at 346-47). While the reasonableness of the length of the delay is commensurate to the complexity and nature of the case, the presumptive prejudice inherent in the delay intensifies over time. *Simmons*, 54 S.W.3d at 759 (citing *Doggett v. United States*, 505 U.S. 647, 652 (1992); *Utley*, 956 S.W.2d at 492; *Wood*, 924 S.W.2d at 346).

Appellant's cases were bound over to the grand jury following a June 4, 2010 preliminary hearing.[3] She was indicted in federal court on June 15, 2010, and the FBI lodged a detainer against her on June 16, 2010, prior to her July 20, 2010 state indictments. At a September 7, 2010 state court hearing, the record reflected that appellant was not present because she was in federal custody. On June 24, 2011, appellant entered guilty pleas in federal court to three counts of aiding and abetting a pharmacy robbery. She was thereafter

---

[2] Appellant states that because the opportunity to obtain concurrent sentencing has passed, she requests relief in the form of a new trial and a "drastic reduction in her bond," neither of which is a remedy for a speedy trial violation.

[3] From the record, it appears that appellant was arrested between May 22, 2010, the date of her last robbery, and June 4, 2010, the date of her preliminary hearing. However, the date of her arrest is not contained in the record on appeal.

returned to state custody, and her trial began on August 30, 2011. Although the delay between indictment and trial was approximately thirteen months in duration, appellant was unavailable for state prosecution for the approximately ten months she was in federal custody. *See State v. Ronnie DeWayne Graham*, Sullivan County No. 754, 1987 WL 18384, at \*4 (Tenn. Crim. App. Oct. 14, 1987). Thus, the delay in trying appellant's case does not trigger a speedy trial inquiry.

Having found that the delay does not necessitate a speedy trial analysis, we are not obligated to conduct a full balancing test with regard to the remaining *Barker* factors. We nonetheless note that the reason for the delay was appellant's transfer to federal custody to stand trial for accompanying criminal offenses. We conclude that any delay falls within the category of "delay necessary to the fair and effective prosecution of the case." *Vickers*, 985 S.W.2d at 5-6. The cases on which appellant was tried in federal court stemmed from the same transactions that gave rise to her state court cases. Disposing of all of appellant's related cases within the same period of time promoted judicial economy. The reason for the delay does not weigh in appellant's favor.

The record clearly indicates that appellant asserted her right to a speedy trial at several junctures during the proceedings. Assertion of the right to a speedy trial weighs heavily in appellant's favor. *Barker*, 407 U.S. 531-32.

Finally, we consider the final and most important factor in the inquiry: whether appellant suffered any prejudice. *Simmons*, 54 S.W.3d at 760. While a criminal defendant has an interest in securing concurrent sentences, our supreme court has rejected the proposition that "the lost possibility of concurrent sentencing is enough in and of itself to require dismissal on speedy trial grounds." *Id.* at 761. Relevant to this inquiry is the federal "doctrine of primary custody."

> In *Ponzi v. Fessenden*, 258 U.S. 254, 260-262 (1922), the Supreme Court first recognized the doctrine of primary jurisdiction, to provide an orderly method of prosecuting an individual who has violated the law of more than one sovereign. Pursuant to this doctrine, the sovereign that first arrests an individual has primary control or custody over him; its claim over him has priority over all other sovereigns that subsequently arrest him; it is entitled to have him serve a sentence that it imposes, before he serves any sentence imposed by another sovereign; and it retains this priority, unless and until it has relinquished its jurisdiction to some other sovereign. *Id.*; *see also United States v. Cole*, 416 F.3d 894, 897 (8th Cir. 2005); *United States v. Collier*, 31 F. App'x 161, 162 (6th Cir. 2002); *In re Liberatore*, 574 F.2d 78, 88-89 (2nd Cir. 1978); *Rambo v. Hogsten*, No. 10-116-ART, 2010 WL 4791970 at \*4

(E.D. Ky. 2010) ("When a defendant violates the laws of two different sovereigns, the rule is that the sovereign which first arrests him acquires the right to prior and exclusive jurisdiction over him.") (internal quotations omitted).

Additionally, this primary jurisdiction continues until the first sovereign has relinquished it in some way. Typically, a sovereign may only relinquish primary jurisdiction in four ways: release on bail, dismissal of the charges, release on parole, or expiration of the sentence. *Cole*, 416 F.3d at 897. Moreover, critical to the circumstances presented here, federal courts have uniformly held that the sovereign that first arrests a prisoner maintains primary custody, even when the prisoner is taken to federal court under a writ of habeas corpus ad prosequendum; in such instances, the prisoner is merely "on loan" to the federal sovereign. *Thomas v. Whalen*, 962 F.2d 358, 361 n.3 (4th Cir. 1992); *see also Huffman v. Perez*, 230 F.3d 1358 (6th Cir. 2000) (unpublished table decision); *United States v. Evans*, 159 F.3d 908, 911 (4th Cir. 1998); *Easley v. Steep*, 5 F. App'x 541 (7th Cir. 2001); *Roche v. Sizer*, 675 F.2d 507, 509 (2nd Cir. 1982); *Silva-Rodriguez v. O'Brien*, No. 7:09-CV-00497, 2010 WL 2326539, at *3 (W.D. Va. 2010) ("Lending an inmate via a writ of habeas corpus ad prosequendum to another jurisdiction does not relinquish a sovereign's primary jurisdiction."); *Pease v. Cauley*, No. 08-CV-144-HRW, 2009 WL 1505734, at *3 (E.D. Ky.2009) ("The well-established rationale is that the second sovereign has only 'borrowed' him and the State retains primary jurisdiction over him."). Moreover, this principle is equally true even when the "loan" to the second sovereign is a lengthy one. *See, e.g., Huffman*, 230 F.3d 1358 at 2; *Rios v. Wiley*, 201 F.3d 257, 271-74 (3rd Cir. 2000); *Banks v. Wilson*, No. 6:09-CV-350-GFVT, 2009 WL 5125282, at *3 (E.D. Ky. 2009).

*Jason H. Williams v. Erin D. Wilson*, No. 6:10-CV-275-GFVT, 2011 WL 2560274, at *1-2 (E.D. Ky. 2011).

Because Tennessee arrested appellant before she was arrested for violation of federal laws, the State of Tennessee maintained "primary custody" of her. This raised two concerns at the trial level: (1) the federal court could not impose its sentence to run concurrently with the state sentence because the state sentence was not yet in effect, *see United States v. Quintero*, 157 F.3d 1038, 1039 (6th Cir. 1998); and (2) the federal court sentence would not begin to run until the state had relinquished custody of appellant, *see Jason H. Williams v. Erin D. Wilson*, 2011 WL 2560274, at *2.

Moreover, the applicable federal sentencing guideline states that "[m]ultiple terms of imprisonment imposed at different times run consecutively unless the court orders that the terms are to run concurrently." 18 U.S.C. § 3584(a). Thus, had the federal indictment been resolved subsequent to the state charges, appellant would have had to overcome the federal statutory presumption in favor of consecutive sentencing. Appellant's federal defense attorney testified in a jury-out hearing that the federal court noted on the record, "[I]f it were up to the court, he would run the sentence[s] concurrent [to the state sentences]." However, the court was not called upon to make such a determination because by operation of law, the federal sentence could not be ordered to run concurrently with a nonexistent state court sentence. To rely on the federal court's remarks would be to engage in supposition. Had sentence alignment been a viable issue for argument in federal court, the court would likely have heard far more evidence pertaining to appellant, including her prior criminal activity and her violation of both judicial diversion and probation. We will not consider the federal court's statement in isolation to establish that appellant has demonstrated that she would have received concurrent sentence alignment in federal court had the state court charges been resolved first. Because appellant has not demonstrated that she would have received concurrent sentences if her state cases had been resolved prior to her federal cases or that the State acted intentionally to deprive appellant of the opportunity for concurrent sentences, she has thus failed to establish that she suffered prejudice as a result of the delay in resolution of her state court charges.

Appellant also asserts that the State failed to act diligently in bringing her case before the court and that the State is guilty of "official negligence" or "bad faith." The State extended a plea offer at the preliminary hearing, anticipating that appellant would be subject to a federal indictment. Appellant and trial counsel opted against entering into a hasty plea agreement before they could review the State's discovery. Appellant was indicted in federal court less than two weeks later. The State represented to appellant that it could not influence the progression of appellant's federal case. On the facts presented, we discern no proof of bad faith or negligence on the part of the State.

With regard to appellant's complaint that the trial court erred in refusing to significantly reduce her bond or grant her release on her own recognizance, we note that the trial court had before it an accused who had allegedly committed several felony robberies while armed with a toy pistol. However, the fact that the "weapon" was a toy was not known to the employees of the drug stores that she victimized. Appellant was charged with committing the string of robberies while on probation. Thus, the trial court properly declined to reduce appellant's bond pending trial.

This court is sympathetic to appellant's plight. However, she has failed to demonstrate that the trial court committed error or that her right to a speedy trial was violated. She is not entitled to relief on this issue.

## B. Sentencing

Appellant challenges the trial court's imposition of three eleven-year sentences for her convictions. The State answers that the trial court's sentencing determination was proper. We agree with the State.

In determining an appropriate sentence, a trial court must consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant makes on his own behalf as to sentencing; and (8) the potential for rehabilitation. Tenn. Code Ann. §§ 40-35-103(5), -113, -210(b) (2010); Tenn. Code Ann. § 40-35-114 (2010 & Supp. 2012). In addition, "[t]he sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(4) (2010 & Supp. 2012).

Pursuant to the 2005 amendments, the Sentencing Act abandoned the statutory presumptive minimum sentence and rendered enhancement factors advisory only. Tenn. Code Ann. § 40-35-114 (2010 & Supp. 2012); Tenn. Code Ann. § 40-35-210(c) (2010). The 2005 amendments set forth certain "advisory sentencing guidelines" that are not binding on the trial court; however, the trial court must nonetheless consider them. Tenn. Code Ann. § 40-35-210(c) (2010). Although the application of the factors is advisory, a court shall consider "[e]vidence and information offered by the parties on the mitigating and enhancement factors in §§ 40-35-113 and 40-35-114." *Id.* § 40-35-210(b)(5). The trial court must also place on the record "what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, to ensure fair and consistent sentencing." *Id.* § 40-35-210(e). The weighing of mitigating and enhancing factors is left to the sound discretion of the trial court. *State v. Carter*, 254 S.W.3d 335, 345 (2008). The burden of proving applicable mitigating factors rests upon appellant. *State v. Mark Moore*, No. 03C01-9403-CR-00098, 1995 WL 548786, at *6 (Tenn. Crim. App. Sept. 18, 1995). The trial court's weighing of the various enhancement and mitigating factors is not grounds for reversal under the revised Sentencing Act. *Carter*, 254 S.W.3d at 345 (citing *State v. Devin*

*Banks*, No. W2005-02213-CCA-R3-DD, 2007 WL 1966039, at \*48 (Tenn. Crim. App. July 6, 2007), *aff'd as corrected*, 271 S.W.3d 90 (Tenn. 2008)).

When an accused challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). If a trial court misapplies an enhancing or mitigating factor in passing sentence, said error will not remove the presumption of reasonableness from its sentencing determination. *Bise*, 380 S.W.3d at 709. This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. *See Carter*, 254 S.W.3d at 346. The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401 (2010), Sentencing Comm'n Cmts.; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

Following the sentencing hearing, the trial court found that appellant had garnered a lengthy criminal history, had shown an unwillingness to comply with conditions of a sentence involving release into the community, and had committed the offenses while on probation. Tenn. Code Ann. § 40-35-114(1), (8), (13)(C) (2010 & Supp. 2012). The court did not find any mitigating factors. The trial court further noted that while appellant's probationary status would allow for consecutive sentencing, it did not find that appellant was "deserving" of consecutive sentences. Accordingly, the trial court sentenced her as a Range I, standard offender to concurrent eleven-year sentences for each of the three convictions to be served in state prison.

Appellant contends that the trial court erred in failing to consider several mitigating factors: that her youth and inexperience substantially impaired her judgment in committing the offenses; that she assisted authorities by providing information about the other individuals involved in the robberies; and that she acted under duress or domination of Aaron Keisler. Tenn. Code Ann. § 40-35-113(6), (9), (12) (2010). She also advances that the catch-all provision of Tennessee Code Annotated section 40-35-113(13) should apply because of her expressions of remorse and regret, her efforts at rehabilitation, and the support of friends and family.

As noted above, the trial court did not find any mitigating factors. Because it found none, it was not necessary for the court to expressly state on the record that the enhancement factors outweighed the mitigating factors; that was implicit in the trial court's ruling. Nonetheless, the weighing of mitigating and enhancing factors is left to the sound discretion

of the trial court and is not a grounds for reversal. *Carter*, 254 S.W.3d at 345 (citation omitted).

Even if the trial court erred in declining to find any mitigating factors, a presumption of reasonableness still attaches to its sentencing decision. *Bise*, 380 S.W.3d at 709. The sentence imposed by the trial court was "within the appropriate range[,] and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10. Under such circumstances, we may not disturb the sentence even if we had preferred a different result. *See Carter*, 254 S.W.3d at 346. Appellant has failed to meet her burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401 (2010), Sentencing Comm'n Cmts.; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

## CONCLUSION

Based on the foregoing, we affirm the judgments of the trial court.

_____
ROGER A. PAGE, JUDGE